## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

LARKIN LEE ANDERSON, JR.; JAYLON HURSTON,

individually and on behalf of all others similarly situated,

　　　　　　　　Plaintiffs,

　　　v.

AMAZON.COM, INC.; AMAZON.COM SERVICES, LLC; AMAZON.COM LOGISTICS, INC.,

　　　　　　　　Defendants.

CIVIL ACTION NO.

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

1.　　Plaintiffs Larkin Lee Anderson, Jr. and Jaylon Hurston bring this action against Amazon.com, Inc., Amazon.com Services, LLC, and Amazon.com Logistics, Inc. (collectively, "Amazon") on behalf of themselves and a proposed class of delivery drivers employed by Amazon's delivery service partners ("DSPs").

2.　　In summary, as alleged herein, beginning in June 2018 and continuing through the present, Amazon designed and implemented a delivery program under which putatively independent contractors provide "last-mile" delivery service for Amazon customers, in exchange for agreeing to a set of contractual policies and practices imposed unilaterally by Amazon. Amazon is the sole buyer in the market for DSP delivery driver labor, resulting in buyer-side monopoly power, also known as monopsony.

1

3. Amazon has used its monopsony power to suppress DSP delivery drivers' wages below the competitive level, both directly and as a result of drivers' limited employment mobility and bargaining power.

4. Plaintiffs allege the following based upon personal knowledge as to matters relating to themselves, and upon information and belief and based on the investigation of counsel as to all other matters:

## I. NATURE OF THE ACTION

5. DSPs contract with Amazon to deliver consumer goods through DSP employee drivers. But DSPs are not true independent businesses. Rather, Amazon designed DSPs to be fully dependent on it.

6. DSPs rely on Amazon for basic infrastructure, including the process for assigning packages and creating delivery routes. To serve any other potential shipper, a DSP would need to re-create that infrastructure.

7. On information and belief, Amazon designed the DSP program to specifically target and recruit delivery drivers who have limited comparable job opportunities.

8. DSP drivers often lack access to comparable employment opportunities with steady compensation. Positions with the United States Postal Service ("USPS"), United Parcel Service ("UPS"), and Federal Express ("FedEx") (together, "traditional delivery services") are limited. These services do not hire enough to be a true competitive restraint on Amazon's power as a buyer of delivery driver labor, and few DSP drivers have a reasonable possibility of securing employment with traditional delivery services.

9. This limited employment mobility means that DSP delivery drivers can be compensated significantly less than UPS, FedEx, or USPS drivers without large numbers of them

leaving DSPs for those employers, and Amazon does not have to pay DSPs enough for DSP delivery drivers to earn compensation comparable to what those employers pay.

10.     But Amazon has done more than take advantage of preexisting market conditions. Rather, through the DSP program's contractual terms, Amazon has inhibited or otherwise prevented individual DSPs from competing for drivers employed by other DSPs. This further limits drivers' employment mobility and salary bargaining power.

11.     On behalf of the Class, defined below, Plaintiffs seek injunctive relief to halt Amazon's abuse of its monopsony power, as well as treble damages to compensate class members for the wages they lost as a result of Amazon's distortion of market forces in the DSP driver market.

## II.     JURISDICTION AND VENUE

12.     Plaintiffs bring claims under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2, seeking treble damages pursuant to Section 4 of the Clayton Antitrust Act, 15 U.S.C. §15, and injunctive relief pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26. This Court has subject matter jurisdiction over the Plaintiffs' claims pursuant to 28 U.S.C. §§1331 and 1337(a).

13.     Venue is proper in this District pursuant to 28 U.S.C. §§1391(b) and (c) and 15 U.S.C. §§15 and 22, as each Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

14.     This Court has personal jurisdiction over all Defendants, as each Defendant is either incorporated or domiciled in this District, enters into DSP contracts within this District, ships goods to consumers in this District, and/or otherwise transacts business within this District.

### III. INTERSTATE COMMERCE

15. The market for DSP delivery drivers in the United States is a national market.

16. Amazon contracts with DSPs, and ships goods using DSP services, in all 50 States, the District of Columbia, and Puerto Rico.

17. Amazon's consumer goods business, including its DSP shipping business, involves a continuous and uninterrupted flow of commerce across state lines. Amazon operates fulfillment and delivery networks that involve interstate shipments.

18. Amazon's abuse of its monopsony power has had a substantial effect on interstate trade and commerce.

### IV. PARTIES

19. Plaintiff Larkin Lee Anderson, Jr. is a resident of Missouri and a former employee driver of an Amazon DSP.

20. Plaintiff Jaylon Hurston is a resident of Georgia and a former employee driver of an Amazon DSP.

21. Defendant Amazon.com, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com, Inc. engages in business across the United States. Amazon.com, Inc. wholly owns and operates Amazon.com Services, LLC.

22. Defendant Amazon.com Services, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon.com Services, LLC engages in business across the United States. Amazon.com Services, LLC manages key e-commerce operations within Amazon, including logistics and fulfillment.

23. Defendant Amazon Logistics, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Washington. Amazon Logistics, Inc. operates the DSP Program, enforces the program's contractual terms, and manages Amazon's last-mile delivery services. On information and belief, Defendant Amazon Logistics, Inc. is a wholly owned subsidiary of Defendant Amazon.com, Inc.

24. Where appropriate, this Complaint refers to Defendants Amazon.com, Inc., Amazon.com Services, LLC, and Amazon.com Logistics, Inc. collectively as "Amazon."

## V. CLASS ACTION ALLEGATIONS

25. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23 as representatives of a Class defined as follows:

> All persons in the United States that were employed as delivery drivers by Amazon delivery service partners ("DSPs") during the period beginning June 1, 2018 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"). Excluded from the Class are (a) Defendants, their subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

26. In the alternative, in the event that the relevant market is defined as limited to New Jersey rather than as one nationwide market, Plaintiffs seek to represent a Class defined as follows:

> All persons in New Jersey that were employed as delivery drivers by Amazon delivery service partners ("DSPs") during the period beginning June 1, 2018 until such time as the anticompetitive conduct alleged herein ceases (the "Class Period"). Excluded from the Class are (a) Defendants, their subsidiaries, affiliate entities, and employees, and (b) all federal or state government entities or agencies.

27. The members of the Class are so numerous that joinder is impracticable. Hundreds of thousands of people have been employed as delivery drivers by Amazon delivery service partners during the Class Period.

28.     There are numerous questions of law and fact that are common to the Class and that predominate over any issues affecting individual members of the Class, including, inter alia:

a.     Whether the relevant market is correctly defined as a national market for DSP delivery drivers;

b.     Whether the relevant market may be correctly defined in the alternative as a New Jersey market for DSP delivery drivers;

c.     Whether Amazon has market power in the relevant market;

d.     Whether Amazon has used its market power to suppress wages in the relevant market;

e.     Whether Amazon's conduct has a legitimate pro-competitive justification;

f.     Whether the conduct herein artificially maintained, preserved, or enhanced Amazon's market power in the relevant market;

g.     Whether Amazon's conduct as alleged herein was specifically intended to monopsonize the relevant market;

h.     Whether Amazon's conduct as alleged herein caused Amazon to have a dangerous probability of monopsonizing the relevant market;

i.     The operative time period and extent of Amazon's antitrust violations;

j.     Whether the conduct alleged herein caused damages to the members of the Class in the form of sub-competitive wages, and the proper measure of such damages; and

k.     The appropriate injunctive and equitable relief for the Class.

29.     Plaintiffs' interests are typical of, and not antagonistic to, those of other or absent members of the Class, such that they can fairly and adequately represent and protect their interests.

6

30. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions, including substantial experience litigating such cases within this District.

31. Class treatment of Plaintiffs' federal antitrust claims is a superior method for the fair and efficient adjudication of this controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

32. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## VI.    FACTS

33. Amazon divisions include an e-commerce platform, consumer goods manufacturing operation, and video content production, and relevant here is its logistics division that coordinates delivery of goods sold on its e-commerce platform.

34. As with any seller that ships its goods to consumers, Amazon needs to account for the complexities of so-called "last-mile" delivery, i.e. movement of goods from a transportation hub to each consumer's address.

35. Prior to launching its DSP program in June 2018, Amazon relied on traditional delivery service providers like UPS, FedEx and USPS for its last-mile delivery needs.

36. As its e-commerce business has grown, however, Amazon has developed the internal capacity sufficient to sustain its own last-mile delivery system. As of June 2018, Amazon Logistics handled nearly a billion packages per year, with expectations that this number would continue to increase.

37. Rather than create a fully in-house delivery force, Amazon designed its DSP program to consist of nominally independent delivery contractors. This design choice shielded Amazon from the regulatory and practical burdens of directly employing delivery drivers. These burdens include labor and workplace laws, and liability stemming from incidents during delivery.

38. In the first year of operations, Amazon signed nearly 180 DSPs. The program expanded rapidly, and by 2024, Amazon had grown the network of DSPs to 4,400, operating across 19 different countries. On information and belief, most of those 4,400 DSPs are in the United States. Today, Amazon delivers the vast majority of its packages in the United States through DSPs.

39. To participate in Amazon's DSP program, each DSP must sign on to a non-negotiable set of contractual terms dictated by Amazon.

40. These terms peg DSP compensation to: (1) a monthly base rate paid per vehicle, based on the size of the fleet that Amazon itself determines a DSP needs, with this size subject to change each month; (2) a weekly hourly base rate based not on the hours actually worked, but on the hours that Amazon estimates the assigned routes will take; (3) an additional payment paid per successfully delivered package; and (4) a fuel allowance paid directly to a DSP's fuel card vendor.

41. The terms also require that drivers be employed at will and functionally prevent DSPs from employing unionized workers.

42. DSP drivers are subject to a contractual arbitration agreement and class action waiver for any claims arising out of their employment by an Amazon DSP.

43. DSPs typically lease Amazon-branded vehicles and require their employee drivers to wear Amazon-branded clothing, eliminating any distinction between Amazon and the independent DSPs in the eyes of the consumers receiving the deliveries.

44. Each DSP is subject to oversight by a "Business Coach" employed directly by Amazon, and DSPs receive package and route assignments directly from Amazon through the Amazon Flex app.

45. As a result of this control structure, DSPs are functionally dependent on Amazon. In order for a DSP to serve another "buyer" of delivery services, it would need to replicate the Amazon infrastructure from scratch.

46. Amazon directs DSP hiring through an online job hub and in-person job fairs for Delivery Associate positions. On information and belief, Amazon even maintains the ability to veto the candidacy of individual applicants in a DSP's onboarding pipeline.

47. Amazon directly monitors and tracks DSP drivers' performance according to Amazon-designed metrics, including by use of artificial intelligence-powered cameras in the driver's vehicle. DSP drivers are subjected to intense pressure to finish hundreds of algorithmically-set stop quotas per day, leading to missed breaks and skipped bathroom breaks while receiving fewer benefits and lower wages than drivers at UPS, USPS, and FedEx.

48. Because resistance of any of these Amazon terms or policies means losing access to Amazon's business and operating infrastructure, DSPs have no leverage to depart from them.

49. Drivers employed by DSPs do not have adequate alternative opportunities to secure full-time steady employment elsewhere in the delivery industry. Employment opportunities at UPS, USPS, and FedEx are scarce and are subject to waiting periods and regulatory hurdles not applicable to employment at an Amazon DSP.

50. As a result of Amazon's market power in the national market for DSP delivery drivers, Amazon DSPs impose sub-competitive wages on their employee drivers.

51. Amazon's own conduct is designed to enable, and does enable, DSPs to maintain driver wages at sub-competitive levels. For instance, on information and belief, Amazon has reacted aggressively and effectively to previous DSP drivers' attempts to organize labor unions, including the use of surveillance, coordinated messaging campaigns, and dissolution of DSP contracts. This resistance of unionization helps shield Amazon from upward pressure on DSP delivery driver wages.

52. Further, the contractual terms of Amazon's DSP program effectively restrict individual DSPs from hiring one another's employees, thereby suppressing employee mobility and the bargaining power that comes with it under healthy economic conditions.

53. The harmful effects of Amazon's monopsony power have attracted the attention of regulators. On August 4, 2026, Jennifer Davenport, the attorney general of New Jersey, filed an antitrust action against Amazon in the United States District Court for the District of New Jersey concerning the conduct alleged here. *See Davenport v. Amazon.com, Inc. et al.*, No. 2:26-cv-09814 (D.N.J.).

## VII. MARKET POWER

54. The market for DSP delivery drivers in the United States constitutes a relevant market for purposes of antitrust law.

55. In the alternative, in the event the Court does not define the relevant market as nationwide, the market for DSP delivery drivers in New Jersey constitutes a relevant market for purposes of antitrust law.

56. Amazon's market power in this relevant market can be proven through either direct or indirect evidence.

10

57.    **Direct Evidence:** As alleged above, through its control of the DSPs, Amazon imposes compensation on DSP drivers that is below the competitive level. The sub-competitive compensation itself constitutes direct evidence of market power.

58.    **Indirect Evidence:** Further, as alleged above, DSP drivers do not have adequate opportunities for comparable employment outside of the universe of Amazon DSPs, and their average salary is lower than the average salary of drivers employed by traditional delivery services like UPS, USPS, or FedEx.

59.    If employment by USPS, UPS, and FedEx were a reasonable alternative for a substantial subset of DSP drivers, there would not be such a noticeable gap in salary between the two groups of drivers. Amazon DSPs would lose enough workers to these alternative employers so that imposing low wages and poor working conditions would be unprofitable.

60.    Amazon controls 100% of the market defined by Amazon DSP delivery driver positions.

61.    The extent of Amazon's control over the infrastructure and internal operating processes of DSPs—detailed above—poses significant barriers to entry for competition to Amazon in this market. It is unlikely that any other company would undertake the expense and logistical burden to develop a copycat DSP system.

## VIII.    CLAIMS FOR RELIEF.

### COUNT ONE
### Monopsonization (15 U.S.C. § 2)

62.    Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

63.    The relevant market is the United States market for Amazon DSP delivery drivers.

64. In the alternative, the relevant market is the New Jersey market for Amazon DSP delivery drivers.

65. Amazon possesses monopsony power in the relevant market.

66. Amazon has used its monopsony power to impose sub-competitive wages on DSP delivery drivers, and continues to do so.

67. Amazon willfully acquired and maintained that monopsony power through anticompetitive agreements with DSPs and anticompetitive policies towards DSPs and their drivers as alleged herein.

68. Amazon is liable for the anticompetitive effects of its agreements with DSPs and its policies towards DSPs and their drivers under a "rule of reason" standard.

69. There is and was no legitimate, non-pretextual, pro-competitive business justification for this abuse of monopsony power that outweighs its harmful effect on DSP delivery drivers. Even if there were some conceivable and cognizable justification, the DSP program's terms were not necessary to achieve such a purpose.

70. As a direct and proximate result of Amazon's anticompetitive conduct, Plaintiffs and the Class have been injured in their business or property by the violation of 15 U.S.C. §2. The injury to Plaintiffs and the Class consists of having received lower wages than they would have received in the absence of that conduct. Such injury is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful.

**COUNT TWO**

**Attempted Monopsonization (15 U.S.C. § 2)**

71. Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

72.     In the alternative, if the relevant market is not limited to DSP delivery drivers but rather includes all last-mile delivery drivers, Amazon has unlawfully and willfully attempted to monopsonize the market through a multifaceted scheme including the anticompetitive acts described herein.

73.     In undertaking this course of conduct, Amazon has acted with specific intent to monopsonize and to destroy effective competition in the market for last-mile delivery drivers.

74.     There is a dangerous probability that, unless restrained, Amazon will succeed in monopsonizing the market for last-mile delivery drivers. Amazon Logistics has grown dramatically and will soon be the largest buyer of last-mile delivery driver labor in the United States.

## COUNT THREE

### Unreasonable Restraint of Trade (15 U.S.C. § 1)

75.     Plaintiffs repeat and reiterate each of the allegations contained in the paragraphs above as if fully set forth herein.

76.     The relevant market is the United States market for Amazon DSP delivery drivers.

77.     In the alternative, the relevant market is the New Jersey market for Amazon DSP delivery drivers.

78.     Amazon possesses market power in the relevant market.

79.     Amazon enters into agreements with DSPs, and a core purpose and effect of those agreements is to restrain competition in the market for Amazon DSP delivery drivers.

80.     Upon information and belief, Amazon's agreements and coordinated efforts with DSPs are not all reduced to writing.

81.    Amazon's anticompetitive agreement terms have harmed competition in the market for DSP delivery drivers, including by decreasing wages and mobility for DSP delivery drivers.

82.    As a direct and proximate result of Amazon's anticompetitive conduct in its agreements with DSPs, Plaintiffs and the Class have been injured in their business or property by the violation of 15 U.S.C. §1. The injury to Plaintiffs and the Class consists of having received lower wages than they would have received in the absence of that conduct. Such injury is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful.

**WHEREFORE, Plaintiffs demand trial by jury and hereby respectfully request:**

(a)    That the Court determine that Plaintiffs' claims regarding the Class alleged herein are suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiffs as the representatives of the Class;

(c)    That Plaintiffs' counsel be appointed as counsel for the Class;

(d)    That the Court award, pursuant to 15 U.S.C. §15, compensatory and trebled damages to the Class resulting from Defendants' violations of the Sherman Act;

(e)    That the Court order, pursuant to 15 U.S.C. §26, permanent injunctive relief preventing Defendants from continuing their unlawful acts in violation of the Sherman Act;

(f)    That Plaintiffs and the Class be awarded their costs, expenses, and reasonable attorney's fees in bringing this action;

(g)    That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest on all sums awarded; and

(h)     Such other and further relief as this Court may deem just and proper.

## IX.     DEMAND FOR JURY TRIAL.

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs Larkin Lee Anderson, Jr., and Jaylon Hurston and the proposed Class, respectfully demand a trial by jury of all issues properly triable to a jury in this case.

Dated: August 6, 2026

Respectfully submitted,

*/s/ A. Luke Smith*
A. Luke Smith
John Radice
Charles Kopel
**RADICE LAW FIRM, P.C.**
475 Wall Street
Princeton, NJ 08540
Phone: (646) 245-8502
Fax: (609) 385-0745
lsmith@radicelawfirm.com
jradice@radicelawfirm.com
ckopel@radicelawfirm.com

*Counsel for Plaintiffs and
the Proposed Class*